**E-Filed 8/8/06**

NOT FOR CITATION

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| ELIZABETH DEL CARMEN PEZOA,<br><br>          Plaintiff,<br><br>     v.<br><br>COUNTY OF SANTA CLARA, et al.,<br><br>          Defendants. | Case Number C 05-03717 JF<br><br>ORDER[1] DENYING MOTION TO DISMISS FIRST AMENDED COMPLAINT<br><br>[re: docket no. 17] |

Plaintiff Elizabeth Del Carmen Pezoa ("Pezoa") alleges employment discrimination against Defendants County of Santa Clara ("the County"), Hung Mahn Nguyen aka Sung Nguyen ("Nguyen"), Bruce Copley ("Copley"), and Does 1 through 25. Defendant County of Santa Clara ("County") moves to dismiss Pezoa's First Amended Complaint ("FAC"). Pezoa opposes the motion. The Court heard oral argument on July 21, 2006. For the reasons discussed below, the motion will be denied.

---

[1] This disposition is not designated for publication and may not be cited.

# I. BACKGROUND

Pezoa alleges the following. Pezoa, originally from Chile, began working for the County at Narvaez Mental Health Center ("NMHC") as a psychiatric social worker on or about June 11, 2001. FAC ¶¶ 9, 13. Nguyen, also employed by the County, "maintained a workplace for psychiatric social workers that was segregated." FAC ¶ 10. "Two groups of workers were designated by managerial policy into a 'Vietnamese Group' and a 'Latino Group' whose working areas were officially designated by hallway signs with those specifications." FAC ¶ 10. Pezoa asserts that the purpose of this physical segregation was "to stymie and prevent interaction between these groups and to instill a sense of inferiority in the 'Latino Group'" FAC ¶ 10.

Pezoa alleges that Nguyen afforded the Latino Team "less flexibility in working conditions" than the Vietnamese Team. FAC ¶ 10. The FAC includes specific allegations in this same vein:[2] On or about September 23, 2002, Nguyen refused to allow Pezoa to meet with a client after hours, having made a similar refusal to Roberto De La Cruz, another Latino Team member. Nguyen allegedly showed more flexibility to two Vietnamese Team members—allowing Tuan Tran to work after hours and leave early on Tuesdays, while allowing Tien Tuong to regularly meet with clients after business hours. FAC ¶ 18. With respect to team meetings, on or about October 17, 2002 Nguyen told the Latino workers to meet daily, though Vietnamese workers continued to meet three times a week. FAC ¶ 24. On or about January 17, 2003, Nguyen required that Pezoa "page[] him" before eating lunch outside of "standard hours." FAC ¶ 33. Finally, on May 27, 2003, Nguyen "looked at [Pezoa]" and told Latino Team members that if they had a question they should ask the "lead" or Nguyen and they "'could not talk among each other in' [their] 'rooms.'" FAC ¶ 40.

Pezoa alleges that the Latino Team was "assign[ed] higher work loads" than the Vietnamese Team. FAC ¶¶ 10, 13. Pezoa alleges specifically that the Latino Team had "a much higher caseload" by a margin of "about twenty cases more" per employee. FAC ¶ 24. Pezoa also

---

[2] The FAC is drafted such that several specific allegations that support Pezoa's first claim appear in support of subsequent claims.

alleges disparity between the teams in covering "officer of the day" duties. On or about January 15, 2003, a Latino Team member reported to Pezoa that "all of the clerical staff had been instructed to give all of the English-speaking officer of the day calls to Latino Team members." FAC ¶ 34. On or about December 10, 2002, Pezoa learned that, per Nguyen's instructions, the Latino Team was to provide "officer of the day" coverage for English-speaking and Spanish-speaking clients.[3] In addition, Pezoa alleges that the Latino Team was assigned "to tour police officers . . . more times than the Vietnamese Team," even though the Latino Team "lacked staff." FAC ¶ 24. Despite the alleged staff shortage, on or about February 21, 2003, Nguyen told staff that "the Latino Team would have a position code deleted/cut." FAC ¶ 35. Pezoa's allegations make clear that, as of November 17, 2003, the Latino Team had four members while the Vietnamese Team had seven. FAC ¶ 50.

      Pezoa "complained all the way up the County's chain of command to the level of the Board of Supervisors." FAC ¶ 14. Pezoa does not indicate precisely when her complaints began, but notes that she initially expressed her concerns to Nguyen "in front of the Latino service team and in his office."

      In response to her complaints, Defendants "retaliated against Plaintiff and/or did nothing to protect her from retaliation." FAC ¶ 56. Pezoa alleges that on or about June 28, 2002, "[i]n an effort to harass and retaliate against Plaintiff," Nguyen "said he did 'not know'" whether he would sign a critical check request for one of Pezoa's clients, eventually signing it "days later." FAC ¶ 17. On or about October 1, 2002, Nguyen admonished De La Cruz for "conspiring against" Nguyen with Pezoa. Two days later, Pezoa and De La Cruz presented Nancy Pena, Mental Health Department Director ("Pena"), and Copley with "documentation depicting caseload discrepancies and concerns regarding Hung Nguyen's management practices." FAC ¶ 22. On October 25, 2002, Nguyen allegedly reported the meeting to the Vietnamese Team and said that if "any member met with 'the union or Nancy Pena' before speaking to him 'they

---

[3] The FAC is inconsistent on this point, with ¶ 11 identifying the date as "12-10-03" while ¶ 31 identifies the date as "December 10, 2002." Given that the allegations are generally presented in chronological order, the Court assumes that the correct date is December 10, 2002.

3

Case No. C 05-03717 JF
ORDER DENYING MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT
(JFEX2)

1  would be reprimanded.'" FAC ¶ 25. On three occasions, starting in November 2002, Nguyen
2  highlighted Pezoa's absence at staff meetings, while on at least one such occasion he ignored the
3  absence of others. FAC ¶¶ 30, 32, 36.
4       Pezoa filed a complaint with the United States Equal Employment Opportunity
5  Commission ("EEOC") sometime before November 12, 2002. FAC ¶ 28. She also alleges
6  subsequent attempts to report her concerns. On or about November 12, 2002, Santa Clara
7  County representative Karen Sweetland "implied she could not take [Pezoa's] complaint"
8  because Pezoa had already filed with the EEOC. FAC ¶ 28. On or about November 15,
9  Defendant Copley responded to concerns about segregation and caseload discrepancy by saying
10 that Pezoa "had 'a personality issue' with [Nguyen]." Pezoa filed a formal grievance with her
11 union regarding Nguyen's management practices on or about December 2, 2002, but after
12 numerous conversations was told by union representative, Winnie Lu, that she had a "personal
13 issue" with Nguyen. Plaintiff wrote a letter outlining her concerns regarding caseloads and
14 staffing to Nguyen on April 30, 2003. On or about May 9, 2003, Plaintiff gave a letter and
15 documentation of her complaints to the office of County Supervisor Blanca Alvarado..
16      On August 28, 2003, the San Jose Local Office of the EEOC issued a determination
17 letter, stating:

> The evidence uncovered during the Commission's investigation establishes that Respondent segregates its psychiatric social workers on the basis of race and/or national origin. Respondent has created a "Latino Room" for its non-Vietnamese social workers. Respondent is not coy about this as it even has hallway signs designating 'Latino Group' and "Vietnamese Group". Moreover the evidence shows that Vietnamese social workers are benefitted by having lower case loads and are accorded more flexibility in work hours than non-Vietnamese. As a result of Respondent's practices, there is little communication or interaction between the various racial and ethnic groups, creating racial and ethnic tension and a hostile work environment.
>
> The investigation also disclosed that Charging Party was retaliated against for engaging in protected activity, in that she continued to be subjected to a segregated work environment and an increased case load after she complained.

Opposition to County of Santa Clara's Motion to Dismiss, Ex. 1.[4]

---

[4] The EEOC determination letter has been noticed by the Court as an exhibit submitted with Pezoa's opposition to County of Santa Clara's motion to dismiss Pezoa's *original*

4

Pezoa alleges that retaliation continued even after the EEOC issued its determination letter. On or about September 9, 2003 the Vietnamese Team lead told Pezoa in private that people in "upper management" had said Pezoa must have a "borderline personality disorder" to be "bringing in the Feds" because "Nguyen is such as [sic] nice man," FAC ¶ 41. Pezoa alleges that "any reasonable mental health care professional" would understand "Borderline Personality Disorder" to refer to a clinical condition described in the DSM IV 301.83 and which would suggest that Pezoa was unfit for her job. Sometime before October 2, 2003, Nguyen told Lynn Hart, and EEOC investigator, that he had experienced problems with sleep, high blood pressure and ulcers since Pezoa started her job. FAC ¶ 43.

On or about October 15, 2003, Latino Team "lead" Ritha Canales-Rossi, appointed by Nguyen and loyal to him, told the Latino Team that "if [they] 'had concerns to go through her first.'" FAC ¶ 44. Pezoa alleges that Canales engaged in "harassment and retaliatory activities" towards Pezoa. Specifically, on or about October 15, 2003, Canales "told [Pezoa] to put down [a] chart and pay attention," although Pezoa alleges it has been her regular practice to review charts during meetings. FAC ¶¶ 46, 51. Canales complained about Pezoa's closed office door, saying "'we don't do that in my culture,' and "made other demeaning orders and comments" to Pezoa. FAC ¶ 56. Additionally, Pezoa alleges that on multiple occasions around October/November 2003, Rosa Maria Ortega, a "clinical staff person" and sister of Ritha Canales, delayed or interfered with the scheduling of Pezoa's clients while promptly assisting Canales' clients. FAC ¶ 44, 46.

Sometime before October 24, 2003, Nguyen was removed or suspended from his post "for child molestation." FAC ¶ 44. Nguyen "has been convicted of sex crimes and is a mentally disordered sex offender." FAC ¶ 14. However, on or about October 24, 2003, Pezoa learned from Sean Chour that Copley "that [Nguyen] may be back within two weeks." FAC ¶ 45. On the same day, Pezoa learned from Dr. Huynh, a staff psychiatrist, that Copley "had made copies of all [Pezoa's] weekly schedules," though not those of other workers. FAC ¶ 45.

---

complaint.

On or about November 14, 2003, Pezoa presented her concerns regarding segregation, caseloads, harassment, retaliation and Nguyen at a meeting attended by Maria Dupras, Executive County of Santa Clara Civil Rights Director; Pat Garcia, Mental Health Compliance Manager; Diane Von Merta, manager of the Equal Opportunity Division; and Defendant Copley. Pezoa presented "everything" regarding Nguyen's practices to Dupras and expressed a fear of "more harassment" if Nguyen were to return. Dupras informed Pezoa of "progressive discipline procedures" and asked "why Pezoa had not taken her concerns to [Sweetland]." FAC ¶ 50.

On or about November 17, 2003, the entire Latino Team met with Copley and "shared concerns regarding Ritha Canales-Rossi, the Team Lead." Copley declined to meet with Pezoa individually. FAC ¶ 51. At the meeting, Canales said that Pezoa was "confrontational and defiant"and Copley supported Canales, "thereby ratifying Ritha Canales' harassment and retaliatory activities." FAC ¶ 51. The teams continued to meet separately, with the Latino Team bearing a heavier caseload with fewer staff. FAC ¶ 52.

On December 11, 2003, Copley asked Pezoa if "she would be willing to transfer to 'Fair Oaks Mental Health' since he was considering bringing Nguyen back to [NMHC]," and asked for a response by January 1. Pezoa also alleges that on seven occasions (though no details are provided in the complaint) Defendants prevented her from transferring from the office. FAC ¶ 56.

On July 19, 2005, the Civil Rights Division of the United States Department of Justice issued a "right to sue" letter. Pezoa brought the instant action on September 14, 2005. On March 3, 2006, the Court dismissed Pezoa's first, second and, third claims with leave to amend. Pezoa filed her First Amended Complaint ("FAC") on April 17, 2006. Pezoa alleges four claims for relief: (1) employment discrimination pursuant to 42 U.S.C. §§ 2000e-2(a)(1) and (2); (2) retaliation pursuant to 42 U.S.C. § 2000e-3(a); (3) violation of California Labor Code §§ 1102.5 and 1105; and (4) failure to prevent discrimination and harassment pursuant to California Government Code § 12940(j).

## II. LEGAL STANDARD

"A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spaulding*, 467 U.S. 69, 73 (1984); *see also Argabright v. United States*, 35 F.3d 472, 474 (9th Cir. 1994). "The issue," in a motion to dismiss, "is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims." *Swierkiewicz v. Sorema*, 534 U.S. 506, 511 (2002). For purposes of a motion to dismiss, the plaintiff's allegations are taken as true, and the Court must construe the complaint in the light most favorable to the plaintiff. *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969); *Argabright*, 35 F.3d at 474. Leave to amend must be granted unless it is clear that the complaint's deficiencies cannot be cured by amendment. *Lucas v. Department of Corrections*, 66 F.3d 245, 248 (9th Cir. 1995). When amendment would be futile, however, dismissal may be ordered with prejudice. *Dumas v. Kipp*, 90 F.3d 386, 393 (9th Cir. 1996).

## III. DISCUSSION

**A.     First Claim: Violations of 42 U.S.C. 2000e-2(1) and (2) (Title VII)**

Pezoa claims that Defendants' conduct constitutes a violation Title VII, 42 U.S.C. 2000e-2.[5] While Pezoa does not clearly articulate a single legal theory, the Court concludes that her

---

[5] 42 U.S.C. § 2000e-2(a) reads as follows:

It shall be an unlawful employment practice for an employer--

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

7

1  allegations are sufficient to support a claim for relief under Title VII for maintaining a hostile
2  work environment.
3       "When the workplace is permeated with discriminatory intimidation, ridicule, and insult,
4  that is sufficiently severe or pervasive to alter the conditions of the victim's employment and
5  create an abusive working environment, Title VII is violated." *Dominguez- Curry v. Nevada*
6  *Transp. Dept.*, 424 F.3d 1027, 1034 (9th Cir. 2005) (quoting *Harris v. Forklift Sys., Inc.*, 510
7  U.S. 17, 21 (1993)). In order to establish a hostile work environment claim on the basis of race
8  or national origin, a plaintiff must show "(1) that she was subjected to verbal or physical conduct
9  based on her race or national origin; (2) that the conduct was unwelcome; and (3) that the
10 conduct was 'sufficiently severe or pervasive to alter the conditions of [her] employment and
11 create an abusive work environment.'" *Galdamez v. Potter*, 415 F.3d 1015, 1023 (9th Cir. 2005)
12 (citing *Vasquez v. County of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003).
13      In the instant case, all of the elements of a hostile work environment claim are alleged.
14 First, Pezoa has alleged that she and the other members of the "Latino Team" were instructed, as
15 a matter of policy, to work in a physically separate working area, designated by a hallway sign,
16 based on their race/national origin. In addition, she has alleged that members of the Latino Team
17 was expected to carry a substantially heavier caseload than their Vietnamese Team counterparts,
18 including extra duties related to English-speaking clients, and were instructed to carry out these
19 functions within more restrictive working hours than the members of the Vietnamese Team.
20      Second, Pezoa's allegations—including her own alleged complaints to management and
21 her allegation that a "sense of inferiority" was instilled by the conduct in question—tend to
22 support the conclusion that the segregation, disparity in duties, and restrictive hours were
23 unwelcome.
24      With respect to the third prong, Pezoa alleges disparity in the workloads between the
25 Latino Team and Vietnamese Team, involving about twenty extra cases per employee, as well as

---

42 U.S.C. § 2000e-2(a)

physical segregation of the workplace. She alleges that this situation persisted for more than a year despite her repeated complaints. In addition, she alleges incidents tending to show that the Latino Team was denied flexibility in hours dating from October 2002, when Nguyen refused to allow her to work late and ordered that the Latino Team "meet everyday," to January 2003, when Nguyen instructed Pezoa regarding lunch hours. These allegations tend to support the conclusion that the workplace was permeated by discriminatory conduct, such that the terms and conditions of Pezoa and other Latino Team members were different than those of the Vietnamese Team. Especially when viewed against the background of alleged refusals by the County or its staff to acknowledge and correct the problems, these allegations tend to show that an abusive work environment existed. Thus, Pezoa's allegations are sufficient to claim violation of 42 U.S.C. 2000e-2 under a hostile work environment theory.

The County nonetheless argues that Pezoa fails to state a claim for discrimination because she has not alleged any economic harm. The Court agrees that Pezoa has made no specific allegations of economic harm.[6] However, "the scope of Title VII's prohibition is not limited to 'economic' or 'tangible' discrimination." *Montero v. Agco Corp.*, 192 F.3d 856, 860 (9th Cir. 1999). Title VII covers more than "'terms' and 'conditions' in the narrow contractual sense." *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998).

Accordingly, the motion will be denied as to Pezoa's first claim. Because Pezoa's allegations are sufficient under a hostile work environment theory, the Court does not reach the question of whether her allegations would suffice under other theories. Nor does the Court reach the question of whether Pezoa has suffered an adverse employment action under Title VII.[7]

---

[6] Pezoa states in her opposition brief that "plaintiff did in fact allege that she suffered economic losses including having to take a cut in hours, resulting in a major decrease in income because of the intolerable condition of employment suffered by non-Vietnamese." Opposition, p. 6. However, no citation to the FAC is given, and none of the allegations appear in the FAC.

[7] As construed by United States Supreme Court and the circuits, Title VII also provides redress for discriminatory *treatment*. In order to make a claim under a discriminatory treatment theory, a plaintiff need not make factual allegations that support each element of a prima facie case of discrimination under the framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The Supreme Court has described that framework as "an evidentiary standard, not a

**B.     Second Claim: Violations of 42 U.S.C. 2000e-3 (Retaliation under Title VII)**

Pezoa next claims that Defendants' conduct constitutes a violation of Title VII, 42 U.S.C. 2000e-3.[8] In order for an action to constitute retaliation, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern and Santa Fe Ry. Co. v. White*, ___ U.S. ____, 126 S.Ct. 2405, 2415 (2006) (citations omitted). While "petty slights or minor annoyances" are not actionable simply because an employee has reported discrimination," *id*. at 2415, "[t]he significance of any given act of retaliation will often depend on the circumstances," with its social impact "depending on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Id*. at 2415. "[A]n 'act that would be immaterial in some situations is material

---

pleading requirement," and one that applies when evidence of discrimination is circumstantial, but "is inapplicable where the plaintiff presents direct evidence of discrimination." *Swierkiewicz*, 534 U.S. at 511 (citations omitted).

While County argues that "to state a cause of action" Pezoa must "provide evidence" that satisfies the four elements of the prima facie case under *McDonnell Douglas*, including suffering an adverse employment action, each of the four cases cited to support this proposition dealt with summary judgment, where the framework is operative, rather than the pleading stage, where it is not. Although *Thomas v. Department of Corrections* suggests that specific allegations of an adverse employment action are required at the pleading stage, that California case interprets FEHA, not Title VII. *See Thomas*, 77 Cal.App.4th 507 (4.Dist. 2000).

[8] At all times relevant to the instant action, 2000e-3 read:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3.

10

Case No. C 05-03717 JF
ORDER DENYING MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT
(JFEX2)

in others.'" *Id*. at 2416.

Some of Pezoa's allegations, such being ordered to put down her chart, or being singled out for missing meetings, appear to be "petty slights or minor annoyances" of the kind that are encountered at every workplace. Other allegations describe conduct that might, at least in context, be materially adverse. For instance, Nguyen's alleged remark that if "any member met with 'the union or Nancy Pena' before speaking to him 'they would be reprimanded,'" might amount to a threat that might dissuade a reasonable employee from continuing to pursue a complaint of discrimination. *See* FAC ¶ 25. Similarly, Nguyen's alleged remark that "the Latino Team would have a position code deleted/cut" could be reasonably interpreted as a threat of termination aimed at Pezoa or others that reported discrimination. FAC ¶ 35.

Given the liberal pleading requirements of the Federal Rules of Civil Procedure and the flexible standard for retaliation articulated in *Burlington Northern*, the Court concludes that Pezoa should have the opportunity to present evidence regarding the context in which the actions she alleges took place in order to show that such actions "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination."

Accordingly, the motion will be denied as to Pezoa's second claim.

**C.     Third Claim: Violations of California Government Code §§ 1102.5 and 1105**

Pezoa next alleges violations of California Government Code §§ 1102.5 and 1105 based on County's alleged "actual knowledge of past retaliation within the Department of Mental Health," FAC ¶ 60, and the failure of County reasonably to investigate complaints and protect employees from retaliation.[9]

---

[9] California Labor Code § 1102.5 currently reads, in relevant part:

(a) An employer may not make, adopt, or enforce any rule, regulation, or policy preventing an employee from disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation.

11

1   As the County points out, "[t]o establish a prima facie case for retaliation under Section
2   1102.5, an employee must show (1) that he engaged in protected activity, (2) that he was
3   thereafter subjected to an adverse employment action by his employer, and (3) that there was a
4   causal link between the protected activity and the adverse employment action." *Love v. Motion*

> (b) An employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation.
>
> (c) An employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation.
>
> (e) A report made by an employee of a government agency to his or her employer is a disclosure of information to a government or law enforcement agency pursuant to subdivisions (a) and (b).
>
> (f) In addition to other penalties, an employer that is a corporation or limited liability company is liable for a civil penalty not exceeding ten thousand dollars ($10,000) for each violation of this section.

Cal. Labor Code §§ 1102.5(a),(b),(d)-(f) (2003). Prior to January 1, 2003, a provision substantially identical, though without the statutory damages, was in effect:

> (a) No employer shall make, adopt, or enforce any rule, regulation, or policy preventing an employee from disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or violation or noncompliance with a state or federal regulation.
>
> (b) No employer shall retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or violation or noncompliance with a state or federal regulation.

Cal. Labor Code §§ 1102.5(a)-(b) (2002). At all times relevant to the present action, § 1105 reads as follows:

> Nothing in this chapter shall prevent the injured employee from recovering damages from his employer for injury suffered through a violation of this chapter.

Cal. Labor Code §§ 1105.

12

*Industries, Inc.*, 309 F.Supp.2d 1128, 1134 (N.D. Cal., 2004) (citing *Morgan v. Regents of University of California*, 88 Cal.App.4th 52, 69 (2000).

The County argues that Pezoa's claim fails because she has not alleged an adverse employment action. Memorandum in Support of Motion to Dismiss, p. 5. The definition of "adverse employment action" under 1102.5 is the same as that applied to retaliation suits under Fair Employment and Housing Act ("FEHA"), Cal. Gov. Code §§ 12940, et. seq. *Patten v. Grant Joint Union High School Dist.* 134 Cal.App.4th 1378, 1387 (2005). The California Supreme Court has held that a retaliation claim under FEHA requires an adverse employment action that "materially affect[s] the terms and conditions of employment." *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal.4th 1028, 1051 (2005). With respect to a retaliation claim, the "materiality" test encompasses not only ultimate employment decisions, "but also the entire spectrum of employment actions that are reasonably likely to adversely and materially affect an employee's job performance or opportunity for advancement in his or her career." *Yanowitz*, 36 Cal.4th at 1054. Further, "there is no requirement that an employer's retaliatory acts constitute one swift blow, rather than a series of subtle, yet damaging, injuries." *Id*. at 1055. The terms or conditions of employment "must be interpreted liberally and with a reasonable appreciation of the realities of the workplace [to further 'the fundamental antidiscrimination purposes of the FEHA']." *Patten*, 134 Cal.App.4th at 1387. As the California Supreme Court has recently stated:

> Retaliation claims are inherently fact specific, and the impact of an employer's action in a particular case must be evaluated in context. Accordingly, although an adverse employment action must materially affect the terms, conditions, or privileges of employment to be actionable, the determination of whether a particular action or course of conduct rises to the level of actionable conduct should take into account the unique circumstances of the affected employee as well as the workplace context of the claim.

*Yanowitz*, 36 Cal.4th at 1052. A plaintiff's allegations are to be considered "collectively under a totality of the circumstances approach." *Id*.

In determining whether Pezoa has alleged a retaliation claim under § 1102.5 adequately, the Court bears in mind the liberal pleading requirements of the Federal Rules of Civil Procedure. In addition, the Court notes the Supreme Court's clear statement in *Swierkiewicz* that the issue in assessing the sufficiency of an employment discrimination case is "whether the

13

claimant is entitled to offer evidence to support the claims," and not whether the claimant has pled facts establishing a prima facie case under a particular formulation, *Swierkiewicz,* 524 U.S. at 511-512.

In the instant case, the Court concludes that Pezoa's allegations are sufficient for a claim of retaliation under 1102.5. Pezoa has alleged, among other things threatened reprimand by her supervisor, an implied threat of dismissal, remarks by "upper management" that she had a "borderline personality disorder" in response to her complaints, and repeated instructions to report grievances to the same individuals (Nguyen and Canales) that allegedly perpetuated the discriminatory atmosphere alleged by her complaint. Under the totality of the circumstances approach, such incidents could be found to constitute an adverse employment action that "reasonably likely to adversely and materially affect" Pezoa's "performance or opportunity for advancement." *Cf. Yanowitz*, 36 Cal.4th at 1052.[10]

Accordingly, the motion will be denied as to Pezoa's third claim.

**D.      Fourth Claim: Violations of Cal. Gov. Code § 12940(j) (Harassment under FEHA)**

Pezoa claims violations of California Government Code § 12940(j), a provision of California's Fair Employment and Housing Act ("FEHA"), based on her central allegations and additional allegations that Defendants failed to prevent or properly investigate discrimination and

---

[10] "California courts often look to Title VII in interpreting the FEHA," though "[o]nly when FEHA provisions are similar to those in Title VII." *State Dept. of Health Services v. Superior Court*, 31 Cal.4th 1026, 1040 (2003).
Specifically, in *Yanowitz*, the California Supreme Court looked to federal Title VII decisions when considering the legislative intent behind FEHA's retaliation provisions. *See Yanowitz*, 36 Cal.4th 1028, 1043, 1049-55. The *Yanowitz* court declined "to interpret the statutory scheme as affording a greater degree of protection against improper retaliation than is afforded against direct discrimination" under California law, *id*. at 1050, noting the agreement between this approach and the Fourth Circuit's now-abrogated approach in *Von Gunten v. Maryland* (4th Cir. 2001) 243 F.3d 858, 863, *abrogated by Burlington Northern and Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405 (2006).
California's courts have not revisited the standard for "adverse employment action" in the context of retaliation since the Supreme Court's recent decision in *Burlington Northern*. While the Court concludes that Pezoa has alleged retaliation adequately under *Yanowitz*, the conclusion would be stronger were the California Supreme Court to adopt the *Burlington Northern* standard.

Case No. C 05-03717 JF
ORDER DENYING MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT
(JFEX2)

harassment.[11] FAC ¶ 63. Section 12940(j) is concerned exclusively with harassment, rather than other discriminatory treatment. As discussed above, Pezoa has succeeded in alleging a hostile work environment under Title VII. Because the standard for a hostile work environment claim is basically the same under both Title VII and FEHA, the same allegations suffice to establish a claim of harassment based on a hostile work environment theory under FEHA.[12] *See Miller v. Department of Corrections*, 36 Cal.4th 446, 462 (2005). Additionally, she has alleged a series of specific attempts to report the alleged harassing conduct. These allegations are adequate to support a finding that Defendants both subjected Pezoa to harassment and failed to take all reasonable steps to investigate the conduct that they knew or should have known about due to the efforts of Pezoa and others to report it.

The County's position with respect to this claim could benefit from clarification. The County argues "part of" Pezoa's fourth claim fails because she has not properly alleged an

---

[11] Section 12940(j) makes it unlawful:

> For an employee . . . or any other person, because of race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex, age, or sexual orientation, to harass an employee . . . . Harassment of an employee, an applicant, or a person providing services pursuant to a contract by an employee other than an agent or supervisor shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action. An entity shall take all reasonable steps to prevent harassment from occurring. Loss of tangible job benefits shall not be necessary in order to establish harassment.

Cal. Gov. Code § 12940(j).

[12] The California Supreme Court has recently reaffirmed its agreement with the United States Supreme Court that "to prevail, an employee claiming harassment based upon a hostile work environment must demonstrate that the conduct complained of was severe enough or sufficiently pervasive to alter the conditions of employment and create a work environment that qualifies as hostile or abusive to employees because of their sex." *Miller v. Department of Corrections*, 36 Cal.4th 446, 462 (2005) (citations omitted). "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id* (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993)).

"adverse employment action," Memorandum in Support of Motion to Dismiss, p. 2, and although much of the brief is devoted to showing the absence of such an action, there is no mention of Pezoa's state law hostile work environment claim or § 12940(j) in the subsequent discussion or in the reply brief. It appears that the County seeks to dismiss any portion of Pezoa's § 12940(j) claim that rests on alleged discriminatory treatment, for which an "adverse employment action" is a required element. However, as noted above, no alleged "adverse employment action" is required to allege a hostile work environment. *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).

Given that only a claim for harassment may be made under § 12940(j), and that Pezoa has alleged such a claim sufficiently based on a hostile work environment theory, it does not appear that there is any cognizable claim based on "adverse employment action" to dismiss.

Accordingly, the motion will be denied as to Pezoa's fourth claim.

### III. ORDER

Good cause therefore appearing, IT IS HEREBY ORDERED that the County's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is DENIED.

DATED: August 8, 2006

JEREMY FOGEL
United States District Judge

Case No. C 05-03717 JF
ORDER DENYING MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT
(JFEX2)

1  This Order has been served upon the following persons:

3  Marguerite M. Buckley    magibee2004@yahoo.com, janbtucker@aim.com

4  John L. Winchester , III   jlw@robinsonwood.com

Case No. C 05-03717 JF
ORDER DENYING MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT
(JFEX2)